AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| United States of America <br> v. <br> Marco R. Merino <br> *Defendant(s)* | ) ) ) ) ) ) ) Case No. 2:21-mj-620 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  January through September 2021  in the county of  Franklin  in the
 Southern  District of  Ohio , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) & (b)(1)(A)(vi) | Possession With Intent to Distribute a Mixture of Substance Containing 400 Grams or More of a Mixture or Substance Containing a Detectable Amount of Fentanyl |
| 18 U.S.C. § 666(a)(1)(B) | Federal Program Bribery |

This criminal complaint is based on these facts:

See attached Affidavit

☒ Continued on the attached sheet.

*Complainant's signature*

Richard W. Steudel, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence. VIA FACETIME

Date: September 27, 2021

*Judge's signature*

City and state: Columbus, OH

Elizabeth A. Preston Deavers, U.S. Magistrate Judge
*Printed name and title*



## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AGAINST:

## MARCO R. MERINO

I, RICHARD W. STEUDEL, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I have worked as an employee of the FBI since 29 September 2010 and have been a Special Agent with the FBI since 06 January 2019. I am currently assigned to the Public Corruption Squad of the Cincinnati Division Columbus Resident Agency. In my capacity as a Special Agent, I work on the Southern Ohio Public Corruption Task Force—comprised of various state and federal agencies—and am responsible for investigating violations of federal law, including, but not limited to, public corruption, civil rights, color of law, extortion, bribery, and theft from programs receiving federal funds. Throughout my career in the FBI, I have conducted and participated in investigations related to public corruption, civil rights, color of law, fraud against the government, healthcare fraud, crimes against children, transnational organized crime, counterterrorism, and counterintelligence.

2. The facts and information contained herein are based on my personal observations, my training and experience, surveillance operations, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3. The majority of conversations and statements used for evidentiary purposes throughout this Affidavit were originally conducted in Spanish. Those communications were then translated into English by an FBI translator in a draft summary form and not verbatim transcriptions. While no direct quotes from the draft summary translations are utilized herein, the words used when describing the statements spoken or written throughout this Affidavit are accurate and true to the meaning of the actual verbatim statements to the best of my knowledge.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to arrest Marco R. MERINO for violations of Possession With Intent to Distribute a Mixture of Substance Containing 400 Grams or More of a Mixture or Substance Containing a Detectable Amount of Fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(vi); and Federal Program Bribery, in violation of 18 U.S.C. § 666(a)(1)(B).

## INVESTIGATIVE BACKGROUND

5. At all times relevant to this Affidavit, Marco R. MERINO was a police officer with the Columbus Division of Police (CPD), assigned to investigate drug crimes. Both the City of Columbus and CPD in the year preceding the date of this Affidavit received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

6. As described below, the investigation to date has shown MERINO engaged in the trafficking of cocaine and fentanyl, including more than 8 kilograms of fentanyl. MERINO also agreed to take official acts in his capacity as a police officer to provide protection and safe transport for multiple transports of cocaine, totaling 47 kilograms. The transports of cocaine were fabrications as part of law enforcement operations. MERINO solicited, agreed to accept, and did accept controlled bribe payments totaling $45,000 for the protected transportation of the 47 kilograms of cocaine.

## PROBABLE CAUSE

7. In January 2021, the Columbus Office of the FBI Southern Ohio Public Corruption Task Force received information MERINO was using his official position to engage in illegal activity—namely, drug trafficking. The complainant, hereinafter referred to as "Cooperating Human Source #1" or "CHS #1," has been determined to be highly reliable, in that CHS #1's information has been corroborated extensively through the use of recorded conversations, recorded telephone calls, physical surveillance, seizure of narcotics provided to CHS #1 by MERINO, and other investigative techniques.

8. CHS #1 provided the following information about MERINO. CHS #1 was charged by a state grand jury with multiple serious narcotics offenses in 2019. The following year, CHS #1 was introduced to MERINO so that CHS #1 could cooperate and work with MERINO in an effort to potentially reduce his sentence. CHS #1 provided information to MERINO about drug activity in and around Columbus, Ohio, but MERINO told CHS #1 that the information did not rise to the level of cooperation warranting a reduction in sentence.

### MERINO Traffics a Half-Kilogram of Cocaine

9. CHS #1 told the FBI that, in an effort to receive a reduced sentence, CHS #1 contacted a supplier of cocaine in the Columbus area, on or about 18 January 2021. The supplier agreed to arrange for the sale to CHS #1 of one-half kilogram of cocaine for $23,500 from an associate of the supplier. MERINO and CHS #1 communicated with each other about the $23,500 cocaine deal after the deal had been arranged. MERINO advised that CPD would not be able to provide CHS #1 the $23,500 for the controlled purchase of cocaine. When told this, CHS #1 offered to use his personal money for the purchase of cocaine. MERINO approved this plan. I know based upon my training and experience that allowing an informant to conduct a law-enforcement-directed purchase of narcotics with personal money is not consistent with legitimate law enforcement activity.

10. According to CHS #1, on 19 January 2021, and before the CHS began cooperating with FBI agents, CHS #1 completed the deal to exchange $23,500 for one-half kilogram of cocaine. Immediately following the deal, CHS #1 communicated with MERINO, and the two met inside a vehicle operated by MERINO. CHS #1 explained to MERINO the details of how the deal occurred and showed MERINO the one-half kilogram of cocaine. MERINO instructed CHS #1 to sell the cocaine so he could be reimbursed for the money he spent on the purchase of the cocaine and possibly make some extra money as well. I know based upon my training and experience that directing an informant to sell narcotics for the informant's

2

personal benefit and outside the direction and control of law enforcement is not consistent with legitimate law enforcement activity. CHS #1 explained he did not want to sell the cocaine because he did not want to get into additional trouble, given he was already awaiting sentencing on drug charges. MERINO then took the one-half kilogram of cocaine from CHS #1 and placed it behind the front right passenger seat of his vehicle. MERINO explained he had three women who could sell the cocaine for him. MERINO explained he would sell the one-half kilogram of cocaine and reimburse CHS #1 for the money made in the purchase. I know based upon my training and experience that this proposed plan is not consistent with legitimate law enforcement activity.

11. Following the meeting described in the previous paragraph, CHS #1 provided information to FBI agents and agreed to be a Confidential Human Source for the FBI.

12. On 27 January 2021, MERINO and CHS #1 met again. At the direction of the FBI, CHS #1 consensually recorded the conversation held inside of a vehicle operated by MERINO. The conversation was conducted in Spanish and was later translated into English by an FBI translator. MERINO started the conversation by explaining that, through another person, he was able to sell only half of the one-half kilogram of cocaine provided to him by CHS #1 on 19 January 2021 (that is, MERINO was able to sell one-quarter kilogram of cocaine). MERINO provided CHS #1 with a clear plastic bag, later determined by the Ohio Bureau of Criminal Investigation (BCI) to contain cocaine. The cocaine was weighed upon evidence submission to weigh 284.8 grams, including the packaging. MERINO also provided another bag to CHS #1 that was later determined by the FBI to contain $10,400 in cash and 800 Mexican pesos. MERINO instructed CHS #1 to sell the remainder of the cocaine to recover the rest of CHS #1's money. MERINO stated, if CHS #1 was unable to sell the rest of the cocaine, MERINO had another person who may be able to buy the remainder of the cocaine that night or the next day. I know based upon my training and experience that directing an informant to sell cocaine for the informant's personal benefit, and directing an informant to sell cocaine outside the direction and control of law enforcement, are not consistent with legitimate law enforcement activity.

13. During the same 27 January 2021 consensually recorded conversation, MERINO outlined a plan to have CHS #1 work on reducing the sentence for his drug charges. Before explaining the plan, MERINO asked CHS #1 if he was wearing a wire (based upon my training and experience, I believe this to be referring to a recording device) and patted the torso of CHS #1. MERINO then described a plan to use CHS #1 to arrest an individual involved in the above-described one-half kilogram deal with CHS #1. MERINO tasked CHS #1 to use the money MERINO just provided to CHS #1 plus the proceeds from the future sale of the remainder of the one-half kilogram of cocaine to purchase more cocaine from the same individual, and to ask to have additional kilograms of cocaine fronted to him—that is, provided to him with expectation of future payment. MERINO would then take some of the cocaine and enter it into the CPD Property Room as evidence. CHS #1 would then be allowed to sell any amount of cocaine that was not taken for evidentiary purposes. MERINO offered to be the one to sell the cocaine for CHS #1 and he would be able to have CHS #1's money in two days or less. I know based upon my training and experience that this plan is not consistent with legitimate law enforcement activity.

3

### MERINO Accepts $4,000 in Exchange for the Protection and Safe Transport of Two Kilograms of Cocaine

14. Over the course of several conversations in March 2021, MERINO and CHS #1 discussed MERINO providing protection and safe transport of cocaine. These conversations were at the direction of the FBI, and the transportation of cocaine was a fabrication as part of a law enforcement operation. The conversations were conducted in Spanish and later translated by an FBI translator. CHS #1 told MERINO he knew of a cocaine dealer who would be willing to front kilograms of cocaine, but that he needed MERINO to protect him. MERINO said he knew someone who could sell kilograms of cocaine quickly. CHS #1 offered to pay MERINO $1,000 or $2,000 per kilogram of cocaine in exchange for protecting CHS #1 during the transportation of the cocaine. MERINO agreed. MERINO agreed over the course of multiple conversations to accept payment in return for protecting the transportation of cocaine.

15. On 22 March 2021, at the direction of the FBI, CHS #1 exchanged text messages with MERINO. The text messages were conducted in Spanish and later translated by an FBI translator. CHS #1 informed MERINO that he would be meeting the supplier of the cocaine in 15–20 minutes and asked MERINO to keep his phone nearby in case CHS #1 was pulled over and needed MERINO to assist CHS #1. MERINO responded in agreement. CHS #1 then texted, thank you, and said he will give MERINO something tomorrow. MERINO replied by texting ok with a thumbs-up emoji.

16. On 23 March 2021, MERINO and CHS #1 met again. At the direction of the FBI, CHS #1 consensually recorded the conversation held inside of a vehicle operated by MERINO. The conversation was conducted in Spanish and later translated by an FBI translator. During the meeting, CHS #1 provided MERINO $4,000 in exchange for MERINO agreeing to provide protection for the previously discussed transportation of two kilograms of cocaine. MERINO suggested that MERINO and his group would follow and investigate the supplier of the two kilograms of cocaine following a future cocaine deal. CHS #1 asked MERINO to be alert because CHS #1 will call MERINO if CHS #1 gets pulled over. MERINO said if CHS #1 got pulled over, MERINO would get there quickly and CHS #1 could leave without a problem. I know based upon my training and experience that accepting payment to protect the transportation of narcotics is not consistent with legitimate law enforcement activity.

### MERINO's Intention to get Mexican Citizenship and Description of Plan to Launder Drug Proceeds

17. On 05 April 2021, MERINO and CHS #1 talked on the telephone which was consensually recorded by CHS #1, at the direction of the FBI. The conversation was conducted in Spanish and later translated by an FBI translator. During the conversation, MERINO said he could not meet right away because he had to get a passport picture. MERINO went on to explain that he was trying to get his citizenship in Mexico.

18. Later, on 05 April 2021, MERINO and CHS #1 met again. At the direction of the FBI, CHS #1 consensually recorded the conversation held inside of another vehicle operated by MERINO. The conversation was conducted in Spanish and later translated by an FBI translator.

4

MERINO stated that he wanted CHS #1 to receive no prison time for his pending drug charges so MERINO and CHS #1 could traffic drugs together. MERINO stated that he and CHS #1 could be partners and that MERINO could cover CHS #1 on the law enforcement side while CHS #1 did the same on the narcotics side. MERINO added he put CHS #1's name in MERINO's system and if the FBI and DEA started to work a case and performed a search in the system [of CHS #1's name], MERINO would be notified. MERINO stated he would then tell the other law enforcement agencies CHS #1 was with MERINO and to leave CHS #1 alone. The recording of the conversation indicates that MERINO ingested cocaine several times, and CHS #1 confirmed that MERINO did so.

19. During the same consensually monitored meeting on 05 April 2021, MERINO stated that after CHS #1 was free from his state drug charges and he and CHS #1 had money from the sale of drugs, MERINO would start buying some properties. MERINO went on to describe a plan to use real estate purchases to launder the money from their drug trafficking. MERINO went on to say he and CHS #1 would start laundering money and explained that this was the only way to hide the money from the government. MERINO provided that he learned about this in classes he had taken, including trainings conducted by the DEA. MERINO whispered that MERINO and CHS #1 would launder the money, no one would notice for a long time and they would both live in peace. MERINO said he wanted to buy some houses in Mexico and turn them into Airbnb properties. The money that would be generated would belong to both MERINO and CHS #1. MERINO stated that a person in Mexico had identified specific properties for him already, and further stated that he was going to Mexico in May and then again in July in order to try to buy properties.

20. On 06 April 2021, MERINO and CHS #1 talked on the telephone which was consensually recorded by CHS #1 at the direction of the FBI. The conversation was conducted in Spanish and later translated by an FBI translator. During the conversation MERINO said he wanted CHS #1 to download an application onto CHS #1's phone that would encrypt their communications. MERINO also stated that he had just gotten back from the Mexican embassy where they fingerprinted his children and took their pictures. MERINO added he had to go to Mexico in order to complete the paperwork for all of their naturalizations.

21. Following the recorded conversation on 06 April 2021, MERINO sent CHS #1 a link to the Apple App Store for an encrypted messaging application.

### MERINO Accepts $8,000 in Exchange for the Protection and Safe Transport of Four Kilograms of Cocaine

22. On 14 April 2021, MERINO and CHS #1 talked on the telephone which was consensually recorded by CHS #1 at the direction of the FBI. The conversation was conducted in Spanish and later translated by an FBI translator. During the conversation, CHS #1 told MERINO he had just received four kilograms of cocaine from a third party. The transportation of cocaine was a fabrication as part of a law enforcement operation. CHS #1 asked MERINO to be alert with MERINO's phone so MERINO could help CHS #1 out if CHS #1 was pulled over. MERINO agreed.

5

23. On 15 April 2021, MERINO and CHS #1 met again. At the direction of the FBI, CHS #1 consensually recorded the conversation held inside of another vehicle operated by MERINO. During the meeting, CHS #1 provided $8,000 to MERINO for payment of the previously described protection of the transportation of the four kilograms of cocaine on 14 April 2021. I know based upon my training and experience that accepting payment to protect the transportation of narcotics is not consistent with legitimate law enforcement activity. During the conversation, MERINO stated that he wanted to arrest the supplier of the cocaine, in part to ensure that CHS #1 would not go to prison. MERINO also stated that he was going to go to Mexico City in July in part to obtain Mexican citizenship.

### MERINO Accepts $2,000 for the Protection and Safe Transport of One Kilogram of Cocaine

24. On 11 May 2021, MERINO and CHS #1 talked on the telephone which was consensually recorded by CHS #1 at the direction of the FBI. The conversation was conducted in Spanish and later translated by an FBI translator. During the conversation, CHS #1 told MERINO that CHS #1 sent a female accomplice to meet with the supplier of cocaine. MERINO then provided his acknowledgment. CHS #1 asked MERINO to standby in case she happens to get pulled over so MERINO could show up. MERINO asked what she was driving and how much it was. CHS #1 replied he thought it was four kilograms of cocaine. CHS #1 stated he will give MERINO the money tomorrow. CHS #1 asked Moreno to stay alert and answer if CHS #1 calls MERINO because if CHS #1 calls, that means the female accomplice had been pulled over. MERINO then provided his agreement. The transportation of cocaine was a fabrication as part of a law enforcement operation.

25. On 12 May 2021, MERINO and CHS #1 met in person. At the direction of the FBI, CHS #1 consensually recorded the conversation held inside of another vehicle operated by MERINO. The conversation was conducted in Spanish and later translated by an FBI translator. During the meeting, CHS #1 told MERINO that CHS #1 was only provided one kilogram of cocaine and provided MERINO with $2,000 for the protection and safe transport of cocaine. I know based upon my training and experience that accepting payment to protect the transportation of narcotics is not consistent with legitimate law enforcement activity.

### MERINO Offers to Provide Protection for Large Shipments of Cocaine

26. On 11 June 2021, MERINO met with and had a conversation with CHS #1 and an FBI undercover employee (UCE #1). The conversation was consensually recorded by CHS #1 and UCE #1 at the direction of the FBI. The conversation was conducted in Spanish and later translated by an FBI translator. UCE #1 was represented to be a higher-ranking member of the drug trafficking operation that CHS #1 worked for. During the conversation, MERINO explained to UCE #1 that he was a law enforcement officer and would be able to assist UCE #1 in the trafficking of narcotics in and through Columbus. MERINO said he could use law enforcement databases to provide protection for UCE #1's narcotics trafficking. MERINO offered to provide protection for UCE #1's large shipments of cocaine in and through Columbus, including offering to intervene in the event that the cocaine were to be intercepted by law enforcement. MERINO also offered to provide protection for the shipment outside of Ohio.

27. In June 2021, CHS #1 was sentenced in state court to a term of community control and no prison time.

### MERINO Distributes Fentanyl

28. On 23 June 2021, MERINO and CHS #1 met in person. During the meeting, which was confirmed via video recording, MERINO provided CHS #1 a package of what was later determined by the Ohio BCI Laboratory to contain a detectible amount of fentanyl. Upon evidence submission, the package was determined to weigh 31.1 grams, including the packaging. According to CHS #1, MERINO described the fentanyl as a sample to be offered to CHS #1's buyers to see if they like the fentanyl and would be willing to buy more of the fentanyl that MERINO could provide. I know based upon my training and experience that providing fentanyl to an informant to further distribute is not consistent with legitimate law enforcement activity.

29. On 24 June 2021, MERINO and CHS #1 had a verbal conversation through the previously described messaging application. The conversation was consensually recorded by CHS #1 at the direction of the FBI. The conversation was conducted in Spanish and later translated by an FBI translator. In discussing the fentanyl that he had provided the previous day, MERINO stated that it had put a woman in the hospital.

### MERINO Travels to Mexico

30. As described above, MERINO told CHS #1 that he was going to travel to Mexico in July 2021. Through records obtained from American Airlines, the FBI was able to establish that MERINO in fact traveled to Mexico on 08 July 2021 and returned on 16 July 2021.

### MERINO Distributes Approximately One Kilogram of Fentanyl and Accepts Payment

31. On 05 August 2021, MERINO and CHS #1 met in person. At the direction of the FBI, CHS #1 consensually recorded the conversation held inside of a vehicle operated by MERINO. The meeting was also video recorded. During the meeting, MERINO provided CHS #1 what was determined upon evidence submission to be 1101.4 grams, including the packaging, of a white powdery substance that was later determined by the Ohio BCI laboratory to contain a detectible amount of fentanyl.

32. On 09 August 2021, MERINO and CHS #1 met again. At the direction of the FBI, CHS #1 consensually recorded the conversation held inside of a vehicle operated by MERINO. The meeting was also video recorded. Prior to the meeting, the FBI provided CHS #1 $32,500 to be provided to MERINO for the fentanyl that MERINO provided to CHS #1 on 05 August 2021. During the meeting, CHS #1 provided the money to MERINO. I know based upon my training and experience that providing narcotics to an informant to further distribute, and accepting payment for the sale of narcotics, are not consistent with legitimate law enforcement activity.

### MERINO Accepts $15,000 in Exchange for the Protection and Safe Transport of 20 Kilograms of Cocaine

33. On 13 August 2021, MERINO met with UCE #1. UCE #1 told MERINO he would be protecting a drug shipment of 20 kilograms of cocaine from the Dayton, Ohio area to an area east of Wheeling, West Virginia. The transportation of cocaine was a fabrication as part of a law enforcement operation. MERINO followed the transport vehicle he was told contained 20 kilograms of cocaine from the Dayton area across Ohio. MERINO continued to follow the transport vehicle into West Virginia, stopping at a location east of Wheeling. At the conclusion of the transportation, UCE #1 met MERINO and provided MERINO with $15,000. I know based upon my training and experience that accepting payment to protect the transportation of narcotics is not consistent with legitimate law enforcement activity. MERINO stated that a portion of the money was for other law enforcement officers working with him to protect the shipment, but no other law enforcement officers were identified by the FBI as driving along as part of the protection. Prior to the payment, MERINO showed UCE #1 that he had a firearm with him by lifting up his shirt and revealing to UCE #1 a concealed firearm. UCE #1 introduced MERINO to the purported buyer of the cocaine, who in fact was an FBI undercover employee (UCE #3).

### MERINO Distributes Multiple Kilograms of Fentanyl

34. On 28 August 2021, MERINO met UCE #3 at a location east of Wheeling, West Virginia. The meeting was conducted in English and was consensually audio and video recorded by UCE #3. MERINO had previously asked UCE #3 if he could help MERINO sell "four," which in my training and experience and work on this investigation, I believe to refer to kilograms of a controlled substance. UCE #3 agreed. During the meeting, MERINO provided multiple packages of a powdery substance that law enforcement determined to collectively weigh 8328.1 grams, including the packaging. Through electronic surveillance and physical surveillance, the United States determined that MERINO traveled from the Columbus area to the meeting with UCE #3 without making a stop outside the Southern District of Ohio. MERINO told UCE #3 that the packages contained 7.5 kilograms of fentanyl. I know based upon my training and experience that providing fentanyl to another person to further distribute is not consistent with legitimate law enforcement activity.

35. On 31 August 2021, samples of the items provided to UCE #3 by MERINO on 28 August 2021 were field tested by the Whitehall Police Department and determined to contain a detectible amount of fentanyl. During the recorded conversation, UCE #3 described the items MERINO provided as cocaine. MERINO then stated, "No no, that's fetty," which in my training and experience I know to be referring to fentanyl. UCE #3 then responded with surprise and the two then talked and made reference to how dangerous of a substance fentanyl is. MERINO responded to the conversation referencing the dangers of fentanyl by nodding his head in agreement and saying "Yeah. Oh yeah dude." MERINO then told UCE #3 twice to "be careful" with the fentanyl and "I am so glad I told you." When UCE #3 discussed that it would have been bad if UCE #3 were to give the fentanyl to someone and the other person were to cut the packaging open without knowing it was fentanyl, MERINO responded by saying "Right, and not even knowing, they'll fucking drop right there" and then laughed.

8

### MERINO Accepts $15,000 in Exchange for the Protection and Safe Transport of Cocaine

36. On 02 September 2021, MERINO met with UCE #3 to initiate a transportation of cocaine from the Dayton area to an area east of Wheeling. The transportation of cocaine was a fabrication as part of a law enforcement operation. On a consensual recording, MERINO confirmed payment of $10,000 for him and an additional $5,000 for two associates, a female associate of MERINO's who led the transport and acted as a lookout for law enforcement along the route, and for a male coworker that MERINO identified as available via radio to intervene with law enforcement along the route. No other law enforcement officers were identified by the FBI as driving along as part of the protection. MERINO then followed a transport from the Dayton area to an area east of Wheeling.

37. Following the transportation, UCE #3 met MERINO and provided MERINO with $16,000 as payment for the protection of the cocaine transport across Ohio as previously discussed, which included an additional $1,000 for the female driver leading the transport from start to finish. I know based upon my training and experience that accepting payment to protect the transportation of narcotics is not consistent with legitimate law enforcement activity.

### CONCLUSION

38. Based on the foregoing facts, I believe there is probable cause for the arrest of Marco R. MERINO for violations of Possession With Intent to Distribute a Mixture of Substance Containing 400 Grams or More of a Mixture or Substance Containing a Detectable Amount of Fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(vi); and Federal Program Bribery, in violation of 18 U.S.C. § 666(a)(1)(B).

I respectfully request that the warrant be issued.

Respectfully submitted,

Richard W. Steudel
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 27th day of September, 2021 at Columbus, Ohio.

ELIZABETH A. PRESTON DEAVERS
U.S. MAGISTRATE JUDGE

9